

ENTERED
08/07/2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **JORGE C. ZAMORA-QUEZADA, M.D.,** | § | **CASE NO: 16-70270** |
| **M.P.H., P.A.; dba MULTI SPECIALTY** | § | |
| **CLINIC; dba MCALLEN ARTHRITIS** | § | |
| **AND OSTEOPOROSIS CENTER; dba** | § | |
| **ANGELES MULTI SPECIALTY CLINIC** | § | |
|     Debtor | § | |
| | § | **CHAPTER  7** |
| | § | |
| | § | |
| | § | **JUDGE EDUARDO V. RODRIGUEZ** |

**MEMORANDUM OPINION**
**DENYING DEBTOR'S MOTION**
**TO CONVERT FROM CHAPTER 7 TO CHAPTER 11**
*Resolving ECF No. 90*

## I.  INTRODUCTION

"The principle of acting in good faith is at the heart of decent work."[1]  In addressing whether a debtor has the right to convert their case, the Supreme Court has held that a debtor who has not been forthright in declaring his assets in bankruptcy may lose a statutory right to change course and seek a repayment plan instead of liquidation.  *In re Marrama*, 549 U.S. 365 (2007).  The instant case presents such a scenario where the primary duty of the Court is to determine whether it should grant Debtor's Motion to Convert Chapter 7 Case to Chapter 11 Case over the protests of Michael Schmidt, the chapter 7 trustee ("*Trustee*"), and a judgement creditor, Hitachi Medical Systems America, Inc. ("*Hitachi*").  ECF No. 90 (the "*Motion to Convert*"); *see also* ECF Nos. 96, 99.  This Court considers the pleadings and briefs filed by the parties; the arguments presented at the hearings held on January 30, 2017, and February 14, 2017; all other evidence in the record; and relevant case law.  For the reasons discussed herein, the Court finds that Debtor's

---

[1] Richard Eyre.

Motion to Convert should be denied.

## II.  FINDINGS OF FACT

This Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052, which incorporates Fed. R. Civ. P. 52, and 9014.  To the extent that any Finding of Fact constitutes a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.  This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is any inconsistency, this Memorandum Opinion controls.

On June 30, 2016, Jorge C. Zamora-Quezada, M.D., M.P.H., P.A. ("*Debtor*") filed a voluntary chapter 7 bankruptcy, pursuant to Title 11 of the United States Code. [2]  ECF No. 1.  Michael B. Schmidt was appointed as the chapter 7 trustee in the case and sought to employ himself on behalf of the estate, which the Court granted.  ECF Nos. 2, 39.  The First Meeting of Creditors was scheduled to be conducted on August 23, 2016.  ECF No. 5.

Debtor included its Schedules and Statement of Financial Affairs with its original petition.  *See generally* ECF No. 1 at 5–37.  In Schedule A/B, Debtor listed the following:

a.  $41,063.59 in cash stemming from three different business bank accounts;

b.  No outstanding accounts receivable of any age;

c.  No inventory on hand;

d.  Two Ford F150 trucks valued at $1,275.00 each for a combined value of $2,550.00;

e.  Intangible property consisting of its National Provider Number, which was valued at $0;

f.  Total of all property on Schedule A/B is $43,613.59.

*Id.* at 5–7, 8, 10.  Debtor's Schedule D provided no secured debts.  *Id.* at 12.  However, Debtor

---

[2] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

did declare a total of $1,118,596.37 in general unsecured debts on Schedule E/F of which $584,663.79 was attributed to HITACHI Medical Systems America, Inc.  *Id.* at 14–25. Schedules G and H stated that Debtor was not a party to any executory contracts and had no co-debtors.  *Id.* at 26–27.

Debtor's Statement of Financial Affairs ("*SOFA*") sets forth the income earned in 2014, 2015, and year-to-date 2016 as, respectively, $6,814,675.00, $5,933,557.80, and $0.  *Id.* at 30. Debtor'S SOFA also provided that it made no payments or transfers to creditors within the 90-day period prior to filing for bankruptcy.  *Id.*  Likewise, the SOFA also stated that no payments or transfers to insiders had been made within the year prior to filing for bankruptcy.  *Id*. at 31.

On July 25, 2016, Trustee filed an adversary proceeding against Debtor, Lone Star National Bank, and Law Offices of Ramon Garcia, P.C.  ECF No. 12 (initiating Adversary Proceeding No. 16-7018).  In the complaint, Trustee alleges, *inter alia*, that on April 8, 2016, Debtor, acting through its principal Dr. Jorge C. Zamora-Quezada ("*Dr. Zamora-Quezada*"), caused a transfer of $600,000.00 to Lone Star National Bank drawn on and paid out of Debtor's bank account at BBVA Compass Bank.  *Id.* at 2, ¶ 6.  Trustee further alleges that Debtor caused a transfer of $100,000.00 to the Law Offices of Ramon Garcia, P.C. on May 10, 2016, from the same BBVA Compass Bank account.  *Id.* at 2, ¶ 7.  Trustee states that both of these transfers occurred within 90 days of Debtor's bankruptcy filing and seeks to avoid these transfers.  *Id.* at 2–3.

On July 28, 2016, Debtor, joined by Center For Arthritis & Osteoporosis I, P.A.,  filed its "Motion to Convert Chapter 7 Case to Chapter 11 Case," which sought to transition its bankruptcy case from chapter 7 to chapter 11 which was opposed by Hitachi and Trustee.  ECF No. 14, 24.  Debtor, however, subsequently withdrew its motion to convert on September 16,

2016.  ECF No. 76.

On August 12, 2016, Debtor filed its "Joint Motion to Withdraw and Substitute Attorney" that sought the withdrawal of Debtor's original attorney, Mr. William A. Csabi, in lieu of Mr. Nathaniel Peter Holzer of Jordan, Hyden, Womble, Culbreth & Holzer, P.C.  ECF No. 33.  Three days later, the Court struck that motion for procedural deficiencies.  ECF No. 35.  Also on August 15, 2016, Mr. Csabi filed his "Motion to Withdraw as Counsel of Record," which was granted by the Court on August 22, 2016.  ECF Nos. 36, 62.

On August 31, 2016, Trustee filed his "Notice of Assets, Notice to Creditors and Other Parties in Interest of the Need to File Claims" provisioning a December 5, 2016 bar date to file a proof of claim. ECF No. 66.

On October 10, 2016, Debtor filed its Motion to Convert, again seeking to convert this case from chapter 7 to chapter 11.  ECF No. 90.  In the Motion to Convert, Debtor avers that it qualifies for a "small business" designation and cites to "11 U.S.C. §51D" as its basis.[3]  *Id.* at 2, ¶ 6.  If converted, Debtor continues, its chapter 11 plan would propose the following:

   a.  Diligently pursue confirmation of its proposed Plan;

   b.  Lifting the stay on Debtor's appeal of the adverse judgment by Hitachi in Ohio;

   c.  Abatement of all avoidance litigation pending final outcome of that appeal;

   d.  Written waivers by Debtor's insiders of the statute of limitations for pursing avoidance

---

[3] Debtor cited a section of title 11 that does not exist.  "Small business debtor" is, however, defined by 11 U.S.C. § 101(51D), which the Court will construe Debtor's citation as being to.  To wit, "small business debtor … means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning or operating real property or activities incidental thereto) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $2,566,050 (excluding debts owed to 1 or more affiliates or insiders) for a case in which the United States trustee has not appointed under section 1102(a)(1) a committee of unsecured creditors or where the court has determined that the committee of unsecured creditors is not sufficiently active and representative to provide effective oversight of the debtor; *and* does not include any member of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050 (excluding debt owed to 1 or more affiliates or insiders)."  § 51D(A)–(B) (emphasis added).

actions against them;

e.  If Debtor wins the appeal, the Plan will be a 100% Plan, funded by the Debtor's non bankruptcy affiliates;

f.  If Debtor loses the appeal, the Plan will allow Hitachi to designate a new Plan Trustee to replace Debtor and the new plan trustee will be entitled to resume pursuit of avoidance actions to fund the Plan.

*Id.* at 2, ¶ 8.  To support this, Debtor asserts that, pursuant to 11 U.S.C. §706(a), "the debtor may convert a case under chapter 7 to a case under chapter 11 . . . of this title at any time, if the case has not been converted under 11 U.S.C. §1112, 1208, or 1307."  *Id.* at 2, ¶ 9.  To which, Debtor asserts that it has not previously converted under those provisions.  *Id.* at 2, ¶ 10.  In addition to statutory provisions supporting its Motion to Convert, Debtor asserts that its "conduct before and during its chapter 7 case was in good faith."  *Id.* at 3, ¶ 11.  Accordingly, Debtor alleges the holding in the Supreme Court's *Marrama* case does not bar conversion of the instant chapter 7 to a chapter 11 proceeding because the facts of this case do not warrant conversion of a chapter 11 to a chapter 7 case.  *Id.* at 3, ¶ 11 (citing to *In re Marrama*, 549 U.S. 365 ( 2007) (the bankruptcy court has equitable discretion to decline a conversion to chapter 11 where cause exists that would mandate conversion to chapter 7 had the case been filed as a chapter 11 in the first instance)). Finally, Debtor alleges it is in the best interest of the creditors to convert the case to a chapter 11 because "there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time and the purported grounds for not converting the case include alleged acts and omissions for which there exists reasonable justification, and all will be cured within a reasonable period of time," and Debtor would "take a more reasoned approach, incurring far less administrative expense and legal fees, while protecting the rights of all estate creditors."  *Id.* at 3, ¶¶ 13–14.  In closing, Debtor's parting shot alleges "[t]he chapter 7 Trustee's approach is sue now, ask questions later."  *Id.* at 3, ¶ 14.

On October 14, 2016, Debtor filed amended Schedules A/B, D, E, F, G, H, Summary, and SOFA.  ECF No. 93.  In the Amended Schedule A/B, Debtor lists the following:

a.  The amended value held in the three BBVA Compass Bank accounts was a total amount of $11,638.49;

b.  Section 11 was amended to state Debtor did have outstanding accounts receivable, but the amount listed was still $0 for both "face amount" and "doubtful or uncollectible accounts" and an unknown value;

c.  inventory in the estimated amount of $3,000.00;

d.  the two Ford F150 vehicles listed at $1,275.00 each for total value of $2,550.00;

e.  National Provider with a value of $0;

f.  Causes of action:

  1.  a "[m]alpractice claim against Jim Grissom" with a requested amount of $0 and an unknown value;

  2.  a "[m]alpractice claim against Bill Csabi" with a requested amount of $0 and an unknown value; and

  3.  a "[b]reach of fiduciary duty claim against Mark William Bernlohr and Jackson Kelly PLLC" with a requested amount of $0 and an unknown value;

g.  contingent claims against Hitachi, "for fraud and lost revenues from defective MRI machines" with a requested amount of $0 and an unknown value; and

h.  total of all property amended to "$17,188.49."

ECF No. 93 at 3–5, 7, 9.

Schedule E/F was amended to list $6,191,092.90 in general unsecured claims, including but not limited to, a previously undisclosed claim for Jorge and Meisy Zamora-Quezada in the amount of $3,724,916.62 for "promissory notes" and at least $1,180.480.78 in Medicare overpayments.  *Id.* at 11–19; *see also* ECF No. 1 at 13–25.  Schedule G was amended to provide:

a.  an engagement letter with Acevedo Consulting, Inc. to provide consultant for medical billing issues;

b.   the lease of the San Antonio office with Asford Oaks Properties, Ltd which was assumed by Center for Arthritis & Osteoporosis I, PA;

c.   the 60-month lease with Everbank Commercial Finance for a Xerox 5955 copier/printer/fax that expires June 2021;

d.   a legal services agreement with Lester J. Perling, P.A. for dispute of Medicare overpayment;

e.   a lease agreement, #27530-38174, with Siemens Financial Services, Inc. for a BN PROSPEC and all equipment related thereto that ends February 2021; and

f.   the lease of multiple copiers, account # 9528, through Wells Fargo Financial Leasing.

ECF No. 93 at 20–21.  Schedule H was amended to list several co-debtors J & M Zamora Family LP ("*J&M FLP*"), Jorge C. Zamora, MD, MPH, Meisy Zamora-Quezada,[4] Zamora-Quezada, Inc. as General Partner for J.C.Z.Q. Family, L.P.  *Id.* at 22–23.  Finally, Debtor's SOFA was amended as follows:

a.   The amount of gross revenue from January 1, 2016, to the filing date as $2,779,853.60;

b.   Pre-petition payments or transfers to creditors within 90 days before filing as $389,927.95;

c.   Pre-petition payments or other transfers of property made within 1 year before filing this case that benefited any insider as $3,061,168.87;

d.   Legal Actions within the prior year was amended to include:

1.   YP Advertising, LP f/k/a AT&T Advertising, L.P. n/k/a YP LLC v Mario Garza and Jorge Zamora-Quezada b/d/b/a Arthritis & Osteoporosis Center, Case No. 30C1300211, pending before the Justice Court of Bexar County, Precinct 3;

2.   AT&T Corp. v. Arthritis & Osteoporosis Centers, Case No. 652039/2014, pending before the Supreme Court of State of New York, County of New York;

3.   Hitachi Medical Systems of America, Inc. v. JCZQ Family, LP and Jorge Zamora-Quezada, MD, MPH, PA, Case No. 2011 03 1669, on appeal from the Court of Common Plea, Summit County Ohio; and

---

[4] During Meisy Zamora's testimony, it was revealed that she has a doctorate from Mexico, but Debtor has consistently listed her on its Witness Lists as "Meisy Zamora" where they refer to Dr. Zamora using his title.  *See* ECF Nos. 143, 159.  As such and to avoid confusion, the Court will refer to Meisy Zamora, as referred to as Meisy Zamora-Quezada, as "Mrs. Zamora."

4. Hitachi Medical Systems of America, Inc v. JCZA Family, LP, *et al.*, Case No. 28139, pending before the Ninth Dist. Court of Appeals, Ohio.

e. Listing the custodian of debtor property as the Law Office of Preston Henrichson and stating that Mr. Henrichson as Receiver garnished BBVC Compass Bank account #xxxx1499 on 6/20/16;

f. Listing the following pre-petition transfers:

1. transferred the Medical Practice to Center For Arthritis And Osteoporosis I, an affiliate, on June 7, 2016 and provides a total value of $0; and

2. transferred assets valued by Debtor at $355,436.00 to J&M FLP, an affiliate, on December 31, 2015.

g. Listing the pre-petition insider transfers, as listed in "SOFA #4," for an approximate total amount of $2,028,442.06.

ECF No. 93 24–27, 31, 36–38; *see also* ECF No. 1.

On October 14, 2016, Debtor filed its "Supplement to Debtor's Amended Schedule B, Part 3, #11" that provided a list of accounts receivable and information for each entry.  ECF No. 94.  To wit, Debtor's supplement listed the following accounts receivable:

a. In response to part 11a.: Insurance receivables from Medicaid, Medicare, and/or private insurance, which are subject to recoupment, but the face amount, doubtful or uncollectable amount, and total amount are each unknown;

b. In response to part 11b: Insurance receivables from Medicaid, Medicare, and/or private insurance, which are subject to recoupment, but the face amount, doubtful or uncollectable amount, and total amount are each unknown;

c. Also in response to 11b: Receivables from Alpha & Omega-Somabel, an affiliate, with a book amount $22,763.01 but face amount, doubtful or uncollectable amount, and total amount are each unknown; and

d. In further response to 11b: Receivables from Recept Pharmacy, an affiliate, with a book amount of $548.93 but face amount, doubtful or uncollectable amount, and total amount are each unknown.

ECF No. 94; *see also* Hitachi Ex. 3.

On October 25, 2016, Trustee filed his response to Debtor's Motion to Convert and

lodges several arguments as to why Debtor is not eligible or qualified to be a debtor in possession. *See generally* ECF No. 96. To wit, Trustee avers that Debtor's principal, Dr. Zamora-Quezada—prior to filing the instant bankruptcy proceeding with the intent to hinder, delay, and defraud Debtor's creditors—transferred Debtor's medical practice and substantially all of its assets to another entity known as Center For Arthritis & Osteoporosis I, P.A. ("*The New P.A.*"). *Id.* at 2–3. Additionally, Trustee alleges that Debtor, through Dr. Zamora-Quezada, was stripped of over $700,000.00 in cash within 90 days of the entry of the order for relief in order to benefit Dr. Zamora-Quezada and other entities that he owns and controls. *Id.* at 2. As such, Trustee alleges that Debtor's and its principal's conduct rise to the level of bad faith such as to warrant denial of conversion to chapter 11. *Id.* (citing to *In re Marrama*, 127 S. Ct. at 1105).

There is more. Trustee further asserts that in addition to the bad faith conduct, there are other reasons why this Debtor should not be allowed to convert to chapter 11, namely: (i) substantial or continuing loss to or diminution of the estate; (ii) the absence of a reasonable likelihood of rehabilitation; (iii) gross mismanagement; (iv) the filing of false bankruptcy schedules; (v) the failure to list assets and transfers which are the subject of Adversary Proceeding No. 16-7018; (vi) the fact that Dr. Zamora-Quezada was aware of his duties and responsibilities that Debtor file true and complete bankruptcy schedules, having previously been in a bankruptcy proceeding himself, Case No. 08-70008, from 2008–2010, and deliberately chose not to do so in this case; (vi) that Dr. Zamora-Quezada's ultimate goal in converting to chapter 11 is so he that can thwart any efforts launched by Trustee to recover the $3 million in pre-petition transfers Debtor ultimately disclosed in its amended Schedules. ECF No. 96 at 2, ¶ 11; *see also* ECF No. 93. Essentially, Trustee asserts that converting to chapter 11 and allowing Dr. Zamora-Quezada and other insiders to retain the $3 million in pre-petition transfers will not

benefit creditors in chapter 11 as it would if Debtor would remain in a chapter 7 proceeding.  *See generally* ECF No. 96.

On November 1, 2016, Hitachi filed its "Response in Objection to Debtor's Second Motion to Convert Chapter 7 Case to Chapter 11 and Joinder in Chapter 7 Trustee's Response." ECF No. 99 (the "*Response*").  In its Response, Hitachi essentially asserts, *inter alia*, that Debtor should not be allowed to convert to chapter 11 for the following reasons: (i) Debtor does not have adequate financing and assets to undertake a chapter 11 reorganization as it only has $17,188.49 in assets and $6,191,092.90 in liabilities; (ii) that Debtor's repeated displays of bad faith and willingness to abuse the legal system by delaying several months before correcting its financial disclosures caused Trustee to pursue adversary proceedings to recover assets that were fraudulently transferred; (iii) that Debtor's main purpose of filing the instant bankruptcy proceeding was to avoid posting an appellate bond in the appeal from Hitachi's adverse judgment in Ohio; (iv) that the reason Debtor transferred assets pre-petition to another entity was to thwart the efforts of a state court-appointed receiver to recover assets from Debtor in order to satisfy Hitachi's judgment; (v) that Debtor has a poor history of managing its financial affairs, namely, the more than $3 million in insider transfers "makes clear that Debtor cannot manage its business separate from the principal's individual affairs;" and (vi) that Debtor was unable to produce documents or provide information to a state court-appointed receiver regarding its financial affairs.  *Id.* at 1–2, 7–17.  For all of these reasons, Hitachi alleges that Debtor is not the proper party to manage its bankruptcy proceedings.  *Id.*

On December 5, 2016, Trustee filed his first fee application seeking the payment of $29,383.21 for time billed and expenses incurred on behalf of the bankruptcy estate.  *See generally* ECF No. 101.  After finding no timely objections were made to Trustee's fee

application and having found that it was ripe for consideration, the Court granted Trustee's request on December 28, 2016.  ECF No. 122.

On January 11, 2017, Debtor filed its "Motion for Reconsideration of [Doc #122] Order for Attorney Fees," which seeks the Court to reconsider its prior order approving Trustee's fee application and deny it altogether or in part.  *See generally* ECF No. 130 ("*Motion to Reconsider*"); *see also* ECF No. 132 (setting Debtor's Motion to Reconsider for hearing on January 30, 2017).  Trustee filed his response on January 26, 2017, wherein he argues the work undertaken in this case has been necessary to unravel conduct by Debtor's principal, Dr. Zamora-Quezada, that allegedly perpetrated fraud upon Debtor's creditors through allegedly fraudulent transfers.  *See generally* ECF No. 145.

On January 25, 2017, Trustee and Hitachi jointly filed an adversary proceeding against Jorge C. Zamora-Quezada, J&M FLP, JCZA Family, LP, Alpha-Omega Management, LLC, Center For Arthritis & Osteoporosis I, PA, Zamora-Quezada Inc., Mrs. Zamora, Jorge A. Zamora, Fabio Gonzalez, Pilar Gonzalez, and Jorge C. Zamora-Quezada and Meisy Zamora-Quezada on Behalf of Minor Children Georgina Zamora and Lucia Zamora.  ECF No. 141 (initiating Case No. 17-7002).  In their joint complaint, Trustee and Hitachi allege several causes of action including, but not limited to: (i) preferential transfers under 11 U.S.C. § 547; (ii) fraudulent transfers under both federal and state law; (iii) breach of fiduciary duty by Dr. Zamora-Quezada; (iv) claim for debt against J&M FLP and Alpha-Omega Management, LLC for loans made by Debtor; and (v) piercing Debtor's corporate veil to pursue Dr. Zamora-Quezada for alleged abuses of Debtor's corporate form.  *See generally id.*

On January 27, 2017, Trustee and Hitachi filed their joint "Supplemental Response in Objection to Debtor's Second Motion to Convert Chapter 7 Case to Chapter 11."  ECF No. 147

("*Joint Response*").   Trustee and Hitachi filed their Joint Response after having engaged in minimal discovery of Debtor.   *Id.* at 1.   In their Joint Response, Trustee and Hitachi lodge several reasons, *inter alia*, why the Court should not allow Debtor to convert to chapter 11: (i) Debtor is no longer a going concern entitled to chapter 11 protection, has no employees or revenue; (ii) Debtor's bad faith purpose in entering bankruptcy; (iii) Debtor attempts to mislead its creditors and the Court about its financial affairs are not absolved by merely correcting inaccurate information; and (iv) Debtor's principal, Dr. Zamora-Quezada, breached his fiduciary duty to Debtor and should not be enabled to do so again.   *See generally id*.

On January 30, 2017, the Court held a hearing on Debtor's Motion to Convert.   *See* Minute Entry 1/30/2017.   At that hearing, Counsel for Debtor, Hitachi, and Trustee all appeared and offered arguments on the pending motions.   *Id.*   Debtor's Counsel offered Debtor's exhibits, numbers 1 to 24, each of which were admitted without objection.   *Id.*   However, Debtor's exhibit 24 was subsequently stricken by the Court.   *Id.*   Trustee and Hitachi, by and through their respective counsels, offered joint exhibits, numbers 1 to 41.   *Id.*   Debtor objected to exhibits 6, 9, 15, 21, and 23.   *Id.*   The Court admitted Trustee's and Hitachi's Exhibits 1–5, 7–8, 10–14, 16–20, 22, 24–33, 36–39, and 41.   *Id.*   Trustee's and Hitachi's Exhibit 40 was admitted, but only as amended to reflect the correct year as 2013, not 2015.   The Court subsequently admitted Trustee's and Hitachi's Exhibits 23 and 43.   The Court also admitted a new Debtor's Exhibit 24 without objection from Trustee or Hitachi.   Debtor called and elicited testimony from Ms. Jeannette Smith, CPA ("*Smith*"), Mr. Preston Henrichson ("*Henrichson*"), Mrs. Zamora, Mr. Felix Ramos ("*Ramos*"), Mr. James P. Grissom ("*Grissom*"), and Dr. Zamora-Quezada.   After hearing testimony, the Court concluded that the parties would need additional time to present their evidence and the hearing was continued to February 14, 2017.   *Id.*; ECF No. 151.

On February 14, 2017, the Court took up the continued matters from the January 30, 2017 hearing. Minute Entry 2/14/2017. Debtor called two additional witnesses, Mr. William Csabi ("*Csabi*") and Trustee. *Id.* Debtor offered an additional exhibit, number 25, which was admitted without objection. *Id.* Hitachi discussed an additional exhibit, number 43, which was never offered or admitted. *Id.*; *see also* ECF No. 164 at 3, 66–69.

At the two hearings, extensive testimony was elicited from a series of individuals called by Debtor. The Court summarizes that testimony as follows:

1. Smith testified as an expert in tax. She testified regarding her relationship with Debtor, preparation of Debtor's taxes, unified accounting method, conversations with various individuals related to Debtor, preparation of financial statements for Debtor, Debtor being undercapitalized, transfer of assets from Debtor to affiliated entities and the basis for such transfers, sources of information used in preparation of taxes and financial statements, and how Debtor treated certain expenses owed to affiliates. The Court found her testimony to be credible.

2. Henrichson testified regarding his experience as Debtor's state court appointed receiver. Specifically, how Henrichson sought Debtor's documents for payroll, billing, finances, to conducting an on-site inspection of Debtor's facility, having to file a motion to compel production with the state court, and a planned meeting for June 30, 2016, that was terminated because Debtor had filed for bankruptcy. Henrichson further testified regarding his interactions with Smith, Ramos, and Mrs. Zamora. The Court finds Henrichson's testimony to be credible.

3. Mrs. Zamora testified regarding her involvement with Debtor and Debtor's affiliates. She testified on the various assets of the entities, Dr. Zamora-Quezada's role in day-to-day

operations of Debtor, meetings with Smith for taxes and transferring assets from Debtor to affiliated entities, the rental agreements between Debtor and an affiliated entity, loans on Debtor's facilities, her understanding of corporations and corporate formalities, treatment of rent owed by Debtor to its affiliates, and Debtor's payment of $600,000.00 for a loan on affiliate-owned property.  The Court assigns little weight to Mrs. Zamora's testimony as it was not only evasive but also not very credible.

4.  Ramos testified regarding his role in Debtor's operations and those of its affiliates. Specifically, Ramos testified about the assets transferred from Debtor to affiliates, his role with Debtor, its affiliates, and Debtor's principal, his involvement with and knowledge of the Hitachi litigation, interactions with Grissom, Csabi, and Henrichson, and the transition of Debtor's operations to the New P.A.  Ramos further testified on cross examination regarding his academic and professional qualifications, sources of his compensation, and preparations for Debtor's bankruptcy and its filings.  The Court finds Ramos' testimony to be somewhat credible.

5.  Grissom testified about his role in consulting with Debtor, Debtor's principal, and Mrs. Zamora on the Hitachi litigation and Debtor's bankruptcy.  Specifically, Grissom testified regarding his recommendation to file chapter 7 as a way to reduce Hitachi's judgment to "zippo" and related discussions with Debtor's principal and Mrs. Zamora, steps taken to prepare the petition and schedules, review of filings, interactions with Henrichson, Debtor's suit against Hitachi, Csabi's role in Debtor's bankruptcy, timing of Debtor's bankruptcy, and strategy behind recommendation of bankruptcy in lieu of appellate bond. The Court finds the credibility of Grissom's testimony not only incredible but problematic.

6.  Dr. Zamora-Quezada testified broadly regarding his role with Debtor, his interactions with

the professionals hired by Debtor, and the affiliated entities and their relationships. Specifically, Dr. Zamora-Quezada testified regarding his interactions with Csabi and Grissom leading up to Debtor's bankruptcy, the Hitachi litigation and his interactions with the various attorneys engaged to represent Debtor, his compensation from Debtor, the history of Debtor's operations and revenues, Debtor's and the New P.A.'s solvency, financial condition, and financial statements reflecting such, Debtor's transition of operations to the New P.A. and related assets, assets transferred to Debtor's affiliates, his personal chapter 11 bankruptcy and reasons for it, identification of his signature on certain filings, not reviewing SOFA prior to signing it, the Amended SOFA and its contents, payment by Debtor to Lone Star Bank, significant transfers to Debtor's insiders when Debtor, according to him, was insolvent, debts affiliates owe Debtor, and feasibility of a chapter 11 plan.   The Court finds Dr. Zamora-Quezada's testimony to be—to put it mildly—wholly lacking in credibility.

7. Csabi testified about his role as Debtor's initial bankruptcy counsel.   Specifically, Csabi testified about his employment by Debtor, meeting and discussions with Dr. Zamora-Quezada and Mrs. Zamora, working with Grissom, reviewing Debtor's financials, role of a chapter 7 trustee, his reliance on Grissom (or lack thereof), termination of his employment, the documents reviewed in preparing Debtor's initial schedules, petition, and SOFA, and his reliance on Debtor's principal and staff for information, and their cooperation.   The Court finds Csabi's testimony to be both problematic and troublesome.

8. Michael Schmidt, Trustee, testified about his role and actions as the chapter 7 trustee appointed to Debtor's case.   Specifically, Trustee discussed the checks he received from Debtor, the request made to Debtor's bank, BBVA Compass, regarding Debtor's accounts,

recoupment efforts by Medicare, status of requests regarding lawsuit with Hitachi, Hitachi's judgment, differences between current chapter 7 and prospective chapter 11 plan, and whether Dr. Zamora-Quezada or Mrs. Zamora interfered with his access the BBVA Compass bank accounts.  The Court finds Trustee's testimony to be wholly credible.

At the conclusion of the hearing, the Court took Debtor's Motion to Convert under advisement and all other matters were abated pending the Court's ruling.  *Id.*

### III.  LEGAL STANDARD

This Court is presented with the question of whether to convert Debtor's chapter 7 case to a chapter 11 case when: (1) Debtor's principal has allegedly committed a myriad of bad faith acts in prior litigation with one of Debtor's creditors; (2) Debtor's principal has also allegedly committed some of those same bad faith acts in the prosecution of this bankruptcy case; (3) Debtor's prospects for a successful reorganization under chapter 11 are tenuous, at best, given the financial condition of Debtor; (4) Debtor's principal allegedly effectuated transfers of multiple assets from Debtor prior to filing the instant case; (5) Debtor's principal allegedly redirected income that would otherwise be directed to Debtor to a new entity; and (6) Debtor has allegedly filed misleading and inaccurate schedules in the instant case.

The Code provides that:

(a) The debtor *may convert* under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title.  Any waiver of the right to convert a case under this subsection is unenforceable.

(b) On request of a party in interest and after notice and a hearing, the court may convert a cause under this chapter to a case under chapter 11 of this title at any time.

(c) The court may not convert a case under this chapter to a case under chapter 12 or 13 of this title unless the debtor request or consents to such a conversion.

(d) Notwithstanding any other provision of this section, a case may not be converted

to a case under another chapter of this title *unless the debtor may be a debtor under such chapter*.

§ 706(a)–(d) (emphasis added).  Similar conditions for conversion are noted in § 707(b)(1) as well.  Ultimately, the permissive language used in § 706 gives a bankruptcy court discretion to grant *or* deny such a request.

The debtor or a party in interest, contingent upon having debtor's consent and after notice and a hearing, may request that a bankruptcy court convert the debtor's case to chapter 11 or 13. §§ 706, 707(b)(1).   Under § 706, a debtor's ability to convert is subject to limitations. Specifically, debtor cannot have previously converted from chapters 11, 12, or 13 to the chapter 7.  § 706(a).  Further, debtor cannot convert to any other chapter if the debtor is not eligible to be a debtor under that chapter.   § 706(d); *see also Marrama*, 549 U.S. at 366, 372–74 (citing to § 706(d) and contrasting bad-faith conduct against the "honest but unfortunate debtor" standard announced in *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)).

In *Marrama*, the Supreme Court delineated the process of converting a Chapter 7 case to a case under Chapter 13.   *Id*.   While the facts of *Marrama* involved a debtor's conversion to chapter 13 as opposed to chapter 11, "a number of other courts have found [*Marrama*] to be instructive or applicable to facts similar to [a chapter 11 conversion]."   *Dan Thomason & Assocs., LLC v. Breakwell*, 2010 U.S. Dist. LEXIS 88367, at *4 (N.D. Tex. Aug. 25, 2010) (citing *In re FMO Assocs. II, LLC*, 402 B.R. 546, 550 (Bankr. E.D.N.Y. 2009), *In re George Love Farming, LC*, 366 B.R. 170, 177-78 (Bankr. D. Utah 2007) ("*Marrama* applies equally in conversions to chapter 11 and chapter 13"), *In re Irmen*, No. 07 B 03103, 2008 Bankr. LEXIS 3292008 WL 320484, at *3 (Bankr. N.D. Ill. Feb. 1, 2008), *In re 10 Bears at Chiloquin, Inc.*, No. 06-62079-FRA7, 2007 Bankr. LEXIS 1997, 2007 WL 1673538, at *2 (Bankr. D. Or. June 6, 2007), and *In re Euro-American Lodging Corp.*, 365 B.R. 421, 425 (Bankr. S.D.N.Y. 2007)).

Furthermore, some "[c]ourts readily apply *Marrama* to deny Chapter 7 to Chapter 11 conversions if facts establish that one of the causes to dismiss or convert a Chapter 11 case are present." *Breakwell*, 2010 U.S. Dist. LEXIS 88367, at *4 (citing *In re Euro-American Lodging Corp.*, 365 B.R. at 425; *In re George Love Farming, LC*, 366 B.R. at 425; *In re Broad Creek*, 371 B.R. 752, 758 (Bankr. D.S.C. 2007)). The Fifth Circuit has held that the bankruptcy court has the authority, pursuant to § 1112, to convert a chapter 11 case to a chapter 7 case or dismiss the case, but the "inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor." *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 371-72 (5th Cir. 1987); *see In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015); *In re Bray & Jamison, PLLC*, No. 11-38957-H3-11, 2012 Bankr. LEXIS 103 (U.S. Bankr. S.D. Tex. Jan. 5, 2012); *In re Gow Ming Chao*, No. 11-38131, 2011 Bankr. LEXIS 4543 (U.S. Bankr. S.D. Tex. Nov. 21, 2011). Furthermore, in discussing a hypothetical example, the Fifth Circuit reasoned that the onus was on the bankruptcy judge, in evaluating the facts at bar, to determine the viability of the individual debtor and their respective progress in bankruptcy through the lens of what is in "the best interest of creditors and the estate." *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d. at 372; *c.f. Matter of Swift*, 3 F.3d 929, 931 (5th Cir. 1993) (stating that the bankruptcy court has the duty as the finder of fact to "distinguish hogs from pigs…").

As was aforementioned, *Marrama* has been equally applied to conversions to chapter 11 cases. In addressing the role of bad faith, the Supreme Court stated that "a debtor who acts in bad faith prior to, or in the course of, filing a Chapter 13 petition by, for example, fraudulently concealing significant assets, thereby forfeits his right to obtain Chapter 13 relief." *Marrama*, 549 U.S. at 367, 373-74. However, the Supreme Court went further stating that "[i]t may also arise in a Chapter 7 case when a debtor files a motion under § 706(a) to convert." *Id.* (citing to a

plethora of circuit decisions that "virtually unanimous[ly hold] that prepetition bad-faith conduct

may cause a forfeiture of any right to proceed with a Chapter 13 case").   Thus, the direct

corollary is that pre-petition bad-faith conduct forfeits a debtor's right to convert to a chapter 11

case as well as chapter 13 because that debtor is "not a member of the class of honest but

unfortunate debtor[s] that the bankruptcy laws were enacted to protect."   *Id.* (internal quotations

omitted); *see also In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d at 371-72.   In

*Marrama*, the Supreme Court stated that the bankruptcy court may deny a motion brought

pursuant to § 706 for bad faith under § 105 as long as the bankruptcy court does not contravene

the Code.   549 U.S. at 382–83.

"The Code gives a bankruptcy court the power to dismiss a Chapter 11 case."  *Czyzewski*

*v. Jevic Holding Corp.*, 137 S. Ct. 973, 984 (2017) (internal quotations omitted) (citing

§ 1112(b)).  The Court states that:

> It is important to keep in mind that Chapter 11 foresees three possible outcomes.
> The first is a bankruptcy-court-confirmed plan. Such a plan may keep the business
> operating but, at the same time, help creditors by providing for payments, perhaps
> over time. The second possible outcome is conversion of the case to a Chapter 7
> proceeding for liquidation of the business and a distribution of its remaining
> assets. That conversion in effect confesses an inability to [fund] a plan. The third
> possible outcome is dismissal of the Chapter 11 case. A dismissal typically
> revests the property of the estate in the entity in which such property was vested
> immediately before the commencement of the case—in other words, it aims to
> return to the prepetition financial status quo.

*Id.* at 979 (citing §§ 1123, 1129, 1141, 1112(a)–(b), 726, 349(b)(3)) (internal quotes

omitted).

In determining whether a debtor is eligible to be a chapter 11 debtor, the bankruptcy court

may look to § 1112(b)(1) which "governs when this Court must convert a Chapter 11 case to a

Chapter 7 or dismiss the case."  *In re Gow Ming Chao*, 2011 Bankr. LEXIS 4543 at *6; *see In re*

*Bray & Jamison, PLLC*, 2012 Bankr. LEXIS 103 at *3. "Section 1112(b)(4) contains a

nonexhaustive list of examples of cause meriting conversion or dismissal." *In re TMT Procurement Corp.*, 534 B.R. at 917; *see In re Bray & Jamison, PLLC*, 2012 Bankr. LEXIS 103 at *4. Section 1112, in relevant portion, enumerates "cause" as:

(A) *substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;*

(B) *gross mismanagement of the estate;*

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to one or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

*See* § 1112(b)(1), (b)(4)(A-P) (emphasis added).

Whilst the provision does not specify bad-faith conduct as "cause" for conversion or dismissal, "[b]ankruptcy courts nevertheless routinely treat dismissal for…bad-faith conduct as implicitly authorized by the words for cause." *Marrama*, 549 U.S. at 365, 367, n.1, 373. The Supreme Court goes on to state that was "no occasion here to articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a … case or to deny conversion. It suffices to emphasize that the debtor's conduct must, in fact, be atypical."

*Id.* at 375, n.11; *see Jacobsen v. Moser (In re Jacobsen)*, 609 F.3d 647 (5th Cir. 2010).

The Fifth Circuit, *inter alia*,[5] has held that "cause" can also be a lack of good faith in the prosecution of the bankruptcy case.  *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071–72 (5th Cir. 1986) (citing to *In re Victory Constr. Co.*, 9 B.R. 549, 551–60 (Bankr. C.D. Cal. 1981)).  In fact, the *Little Creek* court said that "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."  *Id.*; *see also In re Humble Place Joint Venture*, 936 F.2d 814, 817–18 (5th Cir. 1991); H. Miles Cohn, *Good Faith and the Single-Asset Debtor*, 62 AM. BANKR. L. J. 131, 132–36 (1988).

In *Little Creek*, the Fifth Circuit advocates for a totality of the circumstances approach because a finding of a lack of good faith is typically "predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than any single datum."  779 F.2d at 1072.  Moreover, the Fifth Circuit said that a bankruptcy is lacking good faith in a circumstance where a "debtor has one asset, such as … developed property" and the debtor's principal(s) are running the operations, which generates little cash flow, if any at all, or income capable of sustaining the funding of a plan of reorganization.  *Id.* at 1072–73.  The reasoning is that in the circumstance like the one described, "there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's terminal euphoria."  *Id.* at 1073 (internal quotations omitted).

A bankruptcy court reaches a finding of lack of good faith based "upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."  *Id.* at 1072.  However, the movant bears the burden of proving that the alleged

---

[5] The Fifth Circuit cites a plethora of supporting cases for the premise that a lack of good faith is "cause" for dismissing a case.  *In re Little Creek*, 779 F.2d at 1072, n. 2.

"cause" does exist beyond a preponderance of the evidence.  *In re TMT Procurement Corp.*, 534 B.R.at 918 (citing to *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)); *see also* 5 Norton Bankr. L. & Prac. 3d § 103:6.

Even when a court has found *cause*, the court's ability to convert a case to Chapter 7 pursuant to § 1112(b) is limited if "the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion."  § 1112(c). Furthermore, the court must abstain from converting a chapter 11 case to chapter 7 or dismissing a case unless "the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." § 1112(b)(2).  In addition to making that finding and identifying those circumstances, the debtor or any party in interest establishes: (1) there is a reasonable likelihood of timely plan confirmation; and (2) the basis for conversion or dismissing includes debtor's acts, other than under § 1112(b)(4)(A), that do not have a reasonable justification or ability to be cured within a reasonable timeframe.  § 1112(b)(2)(A-B).

In order to prove *cause* under the relevant part of § 1112(b), the movant must demonstrate each element.  Under § 1112(b)(4)(A), the movant must establish that there is both (1) a substantial *or* continuing loss to *or* diminution of the estate <u>and</u> (2) the absence of a reasonable likelihood of rehabilitation.  *In re TMT Procurement Corp.*, 534 B.R. at 918 (citing to *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (6th Cir. BAP 2013)).  When examining the movant's evidence for loss or diminution, "courts must look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate."  5 Norton Bankr. L. & Prac. 3d § 103:7.  The situation presented to the court may be tolerable under the circumstances, but the loss or diminution "should not continue … beyond the point at which

reorganization no longer remains realistic." *Id.*   The alleged loss can be either be "sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of the creditors" or can be an ongoing issue, such as negative cash flow, but need not be both. *In re TMT Procurement*, 534 B.R. at 918; *see also In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D. N.C. 2014); *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009). The rehabilitation analysis focuses not on whether a debtor can propose a plan that can be successful, but rather whether the debtor can be "put back in good condition … [and] whether the debtor's business prospects justify continuance of the reorganization effort." *In re TMT Procurement Corp.*, 534 B.R. at 920–21 (citing to *In re Westgate Prop., Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010), and *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)). A debtor that is merely winding down its business through liquidation has no business prospects. *Id.*

Under § 1112(b)(4)(B), the movant must demonstrate that the debtor, or its principal, has mismanaged the estate after filing bankruptcy, but does not focus on pre-petition conduct. *In re Briggs-Cockerham, L.L.C.*, 2010 WL 4866874, at *4 (Bankr. N.D. Tex. Nov. 23, 2010) (citing to 7 Collier on Bankruptcy ¶ 1112.04[6][b] (16th ed. Rev.), and *In re First Assured Warranty Corp.,* 383 B.R. 502, 544, n. 40 (Bankr. D .Colo. 2008)).

In order to resolve the pending Motion to Convert, the Court must determine whether Debtor is eligible to be a debtor in chapter 11 or whether Debtor is not eligible to become a debtor due to bad-faith conduct amounting to "cause" under § 1112.   § 706; *Marrama*, 549 at 372–74, 382.

## IV. CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and Constitutional Authority

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11." Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter. 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012). This is a core matter as it "concern[s] the administration of the estate." § 157(b)(2); s*ee also In Re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999).[6]

This Court may only hear a case in which venue is proper. 28 U.S.C. § 1408. In its petition, Debtor states its principal place of business is in Edinburg, Texas. Therefore, venue is proper.

This Court has an independent duty to evaluate whether it has the constitutional authority to sign a final order. *Stern v. Marshall*, 564 U.S. 462 (2011). *But see Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938–39 (2015) (holding that parties may consent to jurisdiction on non-core matters). However, unlike the claims in *Stern*, the instant issue derives solely from the Code and cannot exist outside of a bankruptcy proceeding. *Compare* ECF No. 90 *with Stern*, 564 U.S. at 499 ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding."). As such, *Stern* is not applicable and this Court holds constitutional authority to enter a final order and judgment with respect to the core matter at bar.

**Debtor Should Not Be Permitted to Convert to Chapter 11**

The Court is faced with a determination of whether Debtor should be permitted to convert from chapter 7 to a chapter 11. *See* ECF No. 90; *see also Breakwell*, 2010 U.S. Dist. LEXIS

---

[6] "[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."

88367, at *5 (stating "a debtor does not have an unqualified right to convert a Chapter 7 proceeding into a Chapter 11 reorganization").   As such, the Supreme Court's opinion in *Marrama* is instructive of how to make that determination and what standards should apply.  549 U.S. at 366, 372–74.  The Court will split this analysis into two prongs:  the first focusing on bad faith and the second on cause under § 1112(b)(4).

**1.  Debtor has Acted in Bad Faith**

The Court must resolve whether a debtor has acted in good faith and is qualified to be a debtor in the desired chapter, and thus able to convert from chapter 7 to chapter 11, 12 or 13. *Foster v. Holder (In re Foster)*, 530 B.R. 650, 653–54 (Dist. N.D. Tex. 2015) (citing to *Marrama*, 549 U.S. 375–76, and *Law v. Siegel*, 134 S. Ct. 1188, 1197 (2014)).  The analysis permits a bankruptcy court to "dispense with futile procedural niceties in order to reach more expeditiously an end result required by the Code."  *Law*, 134 S. Ct. at 1197.

Here, Debtor and Debtor's principal, Dr. Zamora-Quezada, are alleged to have committed multiple acts of bad faith both prior to and during the course of this bankruptcy, some of which have been freely admitted and documented by Debtor.  *See generally* ECF No. 99; *see also* ECF Nos. 93, 153, 164.  To wit, Hitachi alleges that Debtor significantly misrepresented its financial condition on its initial schedules, compounded that by delaying its corrections, filed for bankruptcy as a litigation tactic to avoid payment of an appellate bond, did not fully cooperate with a state court appointed receiver, and transferred over $3 million of property pre-petition to insiders or affiliated entities.  *Id.*; *Compare* ECF No. 93 *with* ECF No. 1.  Moreover, Debtor has allegedly failed to appear at hearings during its litigation with Hitachi.  ECF No. 99.

Debtor's alleged bad faith occurred not only pre-petition, but continued post-petition as Debtor's initial schedules and SOFA were wildly inaccurate.  To wit, shortly after filing its

Motion to Convert, Debtor filed an Amended SOFA.  *See generally* ECF No. 93.  The Amended schedules and SOFA present an entirely different situation than Debtor's initial schedules and SOFA.  *Compare* ECF No. 93 *with* ECF No. 1 at 5–37.  In its Amended SOFA, Debtor freely admits to the pre-petition transfers of $355,436.00 to J&M FLP, provided documentation of such, and also transferred the medical practice from Debtor to an affiliated entity.  ECF No. 93 at 24–59.

However, these were not the only transfers made to an insider or affiliated entity.  To wit, Debtor paid an additional $2,028,422.06 to various entities on behalf of J&M FLP.  *Compare* ECF No. 93 at 36–38 *with id.* at 27.  Thus, even Debtor's representations, under penalty of perjury, in the Amended SOFA are incredulous.   Further examination of the transfers documented in the Amended SOFA reveals an additional $631,712.68 to Dr. Zamora-Quezada, $5,491.93 to Fabio Gonzalez, $80,892.84 to Jorge Zamora, Dr. Zamora-Quezada's son, $51,954.02 to Mrs. Zamora, $11,033.90 to Lucia Zamora, $12,350.00 to Pilar Gonzalez, $15,053.54 to Georgina Zamora, $222,497.90 to Somabel Spa, an affiliated entity, and $1,760 to Long Chilton on behalf of two affiliated entities.  ECF No. 93 at 39–54.  These additional transfers amount to $1,032,746.81 and an overall grand total of $3,061,188.87.  *Id.* at 24–59.  It does not stop there.

Debtor further disclosed that it owned two airplanes, both of which were "sold" in December 2015, and had been fully depreciated.   *Id.* at 55 (identifying "Date Sold," "Depreciation Allowed," "Cost or Basis," and "Gain or Loss" for each transaction listed therein); *see also Publication 946 (2016), Chapter 1*, IRS.gov (last visited July 24, 2017), *available at* https://www.irs.gov/publications/p946/ch01.html ("Depreciation allowed is depreciation you actually deducted (from which you received a tax benefit)…").  Furthermore, in examining

Debtor's documentation, it appears that the vast majority of the assets sold or exchanged on December 30, 2015, or December 31, 2015, were done so at no gain or loss.  ECF No. 93 at 55–59.

During his cross examination, Dr. Zamora-Quezada testified that one of the airplanes had been given away because it had been heavily damaged and had a 2014 value of approximately $1.4 million according to Debtor's Amended SOFA and 2015 Financial Statements.  ECF No. 153 at 288–90; Hitachi Ex. 33 at 10.  Dr. Zamora-Quezada did not indicate who received the airplane.  ECF No. 153 at 289–90.  As for the second airplane, Dr. Zamora-Quezada testified that it had been sold, as corroborated by the Amended SOFA's attached documentation, for approximately $1.5 million.  ECF No. 93 at 55.  *But see* Hitachi Ex. 33 at 10 (listing the airplane's value as approximately $1.5 million as of December 31, 2015).  According to Dr. Zamora's testimony on cross examination, Debtor was insolvent and had been for a long time.  ECF No. 153 at 282–290.  Irrespective of anything else, transferring assets from an insolvent entity is specifically the type of behavior that the Supreme Court spoke of in *Marrama* when discussed bad faith conduct by a debtor.  *Compare* ECF No. 93 at 55–59 *and* ECF No. 153 at 282–90 *with Marrama*, 549 U.S. at 367, 373–74.

Moreover, Debtor chose to file this bankruptcy on the advice of its counsel at the time, Grissom and Csabi, in an effort to avoid Hitachi's collection efforts for the judgment it holds.  *See generally* Hitachi Ex. 29; *see also In re Davis*, 93 B.R. 501, 503 (Bankr. S.D. Tex. 1987) (reasoning that bankruptcy is not suitable as a litigation tactic, especially when the bankruptcy is essentially a two party dispute between the debtor and a creditor).  Grissom and Csabi, according to their respective testimony, collaborated in creating Debtor's initial petition and schedules.  *See generally* ECF No. 153; *id.* at 305 (stating that "I relied on Mr. Grissom choosing 7 or 11 … But

99 percent of the issue was instead of in lieu of the $700,000.00 they asked me [for] the bond, we get into Chapter whatever and I can prosecute the lawsuit in Ohio."); *id.* at 202–30; ECF No. 164 at 5–23.

When taken in addition to the concealment of assets by filing incomplete or, alternatively, improper schedules, the Court is not hard pressed to find that Debtor and its principal have engaged in rampant bad faith conduct prior to and during the course of this bankruptcy proceeding. *See, e.g.*, *In re Jacobsen*, 609 F.3d at 663; *In re Gartner*, 326 B.R. 357, 375 (Bankr. S.D. Tex. 2005) (stating that "[t]he decision to amend Schedules only after untruths are uncovered is evidence of fraudulent intent."). It is further clear that the Court has been presented with a situation where its "primary duty to distinguish hogs from pigs" is beyond cavil. *Matter of Swift*, 3 F.3d at 931. As such, the Court finds that Debtor's Motion to Convert must be denied. *In re Marrama*, 549 U.S. at 365, 367, n.1, 373; *In re Little Creek Dev. Co.*, 779 F.2d at 1071–72.

## 2.  Debtor is not Eligible to Proceed in Chapter 11

In addition to denying a request to convert for bad faith under *Marrama*, a bankruptcy court can deny a conversion from chapter 7 to chapter 11 by a determination that the debtor is ineligible or would face dismissal under § 1112. *Jevic Holding Corp.*, 137 S. Ct. at 984. The analysis under § 1112(b) focuses on a determination of cause under a non-exhaustive list of factors and is "case-specific, focusing on the circumstances of each debtor." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d at 371–72.

While not specifically stated by Hitachi in its Response, the allegations contained therein give rise for the Court to consider certain portions of § 1112(b)(4). *Compare* § 1112(b)(4)(A)–(P) *with* ECF No. 99. Hitachi essentially alleges that Debtor, through the gross mismanagement

of its principal, Dr. Zamora-Quezada, has caused substantial losses to Debtor's estate, and has no hope of rehabilitation.  *See generally* ECF No. 99; § 1112(b)(4)(A)–(B).  Trustee voices similar arguments in his response to the Motion to Convert.  *See generally* ECF No. 96.  As such, the Court will take each individually.

*Section 1112(b)(4)(A) – Substantial Loss of the Estate and Unlikelihood of Rehabilitation*

Under § 1112(b)(4)(A), the movant must demonstrate that there is either a substantial or continuing loss to or diminution of the estate.  *In re TMT Procurement Corp.*, 534 B.R. at 918. Upon successfully demonstrating that, the Court must also look at whether there is a reasonable likelihood of rehabilitation.  *Id.*  The analysis under § 1112(b)(4)(A) is conjunctive.

Here, it has been alleged that Debtor, acting through its principal, transferred substantial assets to an affiliated entity and to multiple insiders.  *See generally* ECF No. 99.  Debtor, in its Amended SOFA, revealed that it engaged in a systematic series of transfers in the year prior to filing its bankruptcy and even transferred a significant amount of Debtor's assets shortly beforehand.  *See generally* ECF No. 93; Hitachi Ex. 2; *see also* ECF Nos. 153, 164.  According to Mrs. Zamora's testimony, the significant assets that Debtor also stated it had transferred to an affiliated entity were over $300,000.00 and had been on Debtor's books since at least 2008.  ECF No. 93 at 27; ECF No. 153 at 154–57 (describing the status of Debtor's assets and financial condition).  *But see* Debtor Ex. 23 (documenting a transaction between J&M FLP and Rio Bank, and also a letter discussing transferring assets to J&M FLP from an attorney from 2003).

Furthermore, Debtor also revealed that it transferred its medical practice to the New P.A. ECF No. 93 at 27; *see also* ECF No. 153 at 241–42 (testifying about the transition of the medical practice to the New P.A., "every single billing from [the transition] forward was going to be a new PA," and that "the old PA is over").  Thus, it has been demonstrated that not only has there

been a substantial loss and diminution of estate property shortly before filing, but the transfer of

the medical practice from Debtor to the New P.A. represents an ongoing loss and diminution to

the estate due to being deprived of what would otherwise be its assets and sources of income.

*Compare* § 1112(b)(4)(A) *with* 11 U.S.C. § 1115 *and* ECF No. 93 *and* Hitachi Ex. 2.

Turning to the issue of likelihood of rehabilitation, Debtor has proposed that the affiliated

entities would fund a 100% plan if it successfully appeals the Hitachi litigation, and if not, then

Debtor would accept the appointment of a chapter 11 trustee and prosecution of avoidance

actions.  ECF No. 90 at 2.  The distinction between proceeding in chapter 7 and the appointment

of a chapter 11 trustee to oversee Debtor's bankruptcy seems to be one without a difference.

Both will incur administrative expenses on behalf of the estate in the course of performing their

required duties, some of which have already been performed by Trustee.  While the exact

amount of such expenses cannot be determined at present, the potential for a chapter 11 trustee to

duplicate the work done by Trustee could be significant.  Thus, the Court will focus primarily on

whether Debtor possesses a reasonable likelihood of rehabilitation.  On that note, the issue of

major relevance is that Debtor transferred the medical practice to an affiliated entity, the New

P.A. shortly before the instant bankruptcy was filed.  ECF No. 93 at 27; *see also* Hitachi Ex. 2.

During the January 30, 2017 hearing, Dr. Zamora-Quezada, on direct examination,

testified how Debtor acted to generate the income used to pay expenses related to its operations

and also to pay his personal expenses in lieu of taking income.  ECF No. 153 at 240.  This

testimony was confirmed, as to Debtor's 2015 tax return, by Ms. Smith, Debtor's CPA, who

went further in her testimony during cross examination in describing the effect of the expenses

paid by Debtor had on its ordinary business income.  *Id.* at 83.  However, Mrs. Zamora testified

that she had not reviewed Debtor's 2015 Financial Statement that was created by Ms. Smith.  *Id.*

at 152–53.  Yet Mrs. Zamora functioned as the operational control person for both Debtor and some of its affiliated entities.  ECF No. 153 at 175–76.  Mrs. Zamora's indifference towards Debtor's financial condition is surprising given her testimony during cross examination that the affiliated entities relied upon Debtor's income when seeking financing for rental properties.  *Id.* at 168–69.  However, that is no longer case as Debtor's principal transferred the medical practice from Debtor to the New P.A. and the revenue necessary to rehabilitate Debtor.  *Compare* ECF No. 153 at 241–45 *and* ECF No. 93 at 27 *and* Hitachi Ex. 2 at 27 *with* ECF No. 90.

The loss of Debtor's assets and income represents a continuing loss of what would otherwise be—and previously was estate—property.  11 U.S.C. § 1115.  Instead of Debtor rehabilitating itself, it proposes to have its affiliates fund the Plan.  ECF No. 90 at 2.  Given the state of Debtor's financial affairs and its future, the funding source is not the Court's primary concern, but rather what is Debtor being rehabilitated for, as it has few assets and virtually no income, and if Debtor's affiliates are capable of it.  *Breakwell*, 2010 WL 3385025, at *2 (finding that debtors must not only have "adequate financing and assets" but must also be able to manage itself as a debtor).  Debtor's primary income source, Dr. Zamora-Quezada's medical practice, has been transferred to the New P.A. that will serve to replace the now defunct Debtor.  ECF Nos. 93 at 27, 153 at 241–45; *see also* Hitachi Ex. 2.  Dr. Zamora-Quezada's business plan is to move forward with the New P.A., so there is nothing to rehabilitate because Debtor is obsolete and being wound down.  ECF No. 153 at 241–45; *compare* Hitachi Ex. 39 (providing 2014 financial statements) *with* Hitachi Ex. 40 (providing 2015 financial statements).  Even if Debtor were rehabilitated, there are no business prospects just as there were none in *In re TMT Procurement Corp.  Compare* 534 B.R. at 920–21 *with* ECF No. 90 at 2; *see also In re Little Creek Dev. Co.*, 779 F.2d. at 1073.  Therefore, the Court finds that Hitachi and Trustee have


demonstrated that there is not a reasonable likelihood of rehabilitation because Debtor has no business prospects and is merely being wound down in favor of the New P.A. *In re Little Creek Dev. Co.*, 779 F.2d. at 1073; *In re TMT Procurement Corp.*, 534 B.R. at 920–21.

In conclusion, it has been demonstrated that Debtor, *vis-à-vis* its principal, has caused both substantial and continuing losses to the estate and that there is no likelihood of rehabilitating Debtor because it has no business purpose aside from winding down its operations. As such, Hitachi and Trustee have demonstrated "cause" under § 1112(b)(4)(A) to disqualify Debtor from being a debtor in chapter 11.

*Section 1112(b)(4)(B) – Gross Mismanagement of the Estate*

As discussed above, eligibility of a debtor seeking to convert to chapter 11 can be determined by analyzing whether their case could be dismissed for "cause," pursuant to the non-exhaustive list in § 1112(b)(4).  Many of those factors under § 1112(b)(4) focus on a debtor's conduct during the prosecution of their bankruptcy case.  Section 1112(b)(4)(B) is no exception. To determine whether a debtor has engaged in gross mismanagement of the estate, the Court must look at the debtor's post-petition conduct only.  *In re Briggs-Cockerham, L.L.C.*, 2010 WL 4866874, at *4.

Here, Trustee and Hitachi have demonstrated a litany of alleged conduct by Debtor, *vis-à-vis* its principal, Dr. Zamora-Quezada, that could be indicia of gross mismanagement of the estate.  *See generally* ECF Nos. 96, 99; *see also* ECF No. 93; Hitachi Ex. 2.  However, this conduct is all pre-petition and outside of the analysis.  While it is insinuated that permitting Debtor to convert to chapter 11 and assume the position of a Debtor in Possession is liken to placing the fox in charge of the hen house, neither party has demonstrated post-petition conduct to demonstrate that point.  *See, e.g.*, *In re West Delta Oil Co.*, 432 F.3d 347 (5th Cir. 2005)

(analogizing requirements of Fed. R. Bankr. P. 2014 as "allow[ing] the fox to guard the proverbial hen house…"). As such, the Court must find that Debtor, by and through its principal, has not, post-petition, grossly mismanaged the estate and the Motion to Convert cannot be denied on this basis.

## V. CONCLUSION

Pending before the Court is a single matter, Debtor's Motion to Convert. ECF No. 90. The analysis under a motion to convert in chapter 7 looks to whether the debtor has engaged in bad faith or is otherwise eligible to become a debtor in the desired bankruptcy chapter. *Marrama*, 549 U.S. at 367, 373–74. Here it was alleged that Debtor, by and through its principal, had engaged in bad faith conduct in prior litigation and in this case by misrepresenting its financial condition to its creditors in its original Schedules and then untimely amending them. *See generally* ECF No. 96, 99.

Prior to the hearings held by the Court on January 30, 2017, and February 14, 2017, Debtor amended its SOFA to provide, *inter alia*, details of pre-petition transfers to insiders and affiliates. *See* ECF No. 93. Hitachi and Trustee argue that Debtor should not be permitted to convert to a chapter 11 because it is defunct, has no income, and no business prospects. Moreover, Debtor's pre-petition conduct of significant transfers of its assets and income to insiders and affiliates when it was insolvent, unaccounted for assets, and using its bankruptcy as a litigation tactic is indicative of bad faith.

The Court, in reviewing these allegations, finds that Debtor had transferred significant assets that it owned prior to filing for bankruptcy, but most notably the medical practice which gutted Debtor of the income and assets it could have used to rehabilitate itself. Furthermore, as Debtor is no longer operating and is being wound down, primarily due to the shift of Dr.

Zamora-Quezada's medical practice to the New P.A., there is nothing left to rehabilitate. Simply put, the Court finds that Debtor is not much more than a mere husk of its former self. In total, the Court finds Debtor has engaged in bad faith conduct prior to and during the course of this bankruptcy and is not eligible to be a debtor in chapter 11 because of substantial and continuing losses to the estate and no likelihood of rehabilitation. As such, Debtor's Motion to Convert to chapter 11 must be denied.

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.


SIGNED 08/07/2017.


Eduardo V. Rodriguez
United States Bankruptcy Judge